UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IPSOS MMA, INC.,

                Plaintiff,

- against -

JOHN DOE,

                Defendant.

Case No. 21-cv-8929

## COMPLAINT

Plaintiff Ipsos MMA, Inc. ("Plaintiff" or "MMA"), by its attorneys Proskauer Rose LLP, for its Complaint against John Doe, alleges as follows:

### NATURE OF THE ACTION

1. This action arises from Defendant John Doe's surreptitious misappropriation of numerous highly confidential, proprietary, and extremely valuable trade secrets belonging to MMA.

2. On August 23, 2021, Doe gave notice that he was resigning from MMA. He then spent nearly a month misleading MMA as to where he intended to work, all the while knowing that he intended to work for MMA's number one competitor.

3. In the weeks leading up to his notice of resignation and virtually up through his last day with MMA, Doe, an ███ national, copied dozens of MMA's most important, sensitive intellectual property, and stored them on two portable USB drives.

4. Doe agreed during his employment that he would not take with him any MMA property when he left, and that he would return all such property. He agreed again on

1

August 30 that he would return all company property, including all computer files. Yet, he did not return the USB drives containing MMA's trade secrets. And he deleted all information from the company mobile phone he returned at the conclusion of his employment, no doubt in order to cover up his malfeasance.

5. After Doe revealed on September 20 that he intended to work for MMA's top competitor, MMA hired a leading forensic investigation firm to analyze the company-issued computer and mobile phone that Doe returned at the conclusion of his employment and to investigate if Doe had done anything improper with MMA's confidential data. That investigation revealed Doe's extensive copying of MMA files.

6. Unsurprisingly, MMA and its outside forensic consultant cannot determine, from company resources or outside, public sources, what Doe has done with MMA's trade secrets since he misappropriated them. These facts can only be confirmed and determined through a forensic examination of Doe's computer and other electronic storage platforms.

7. MMA brings this action to obtain relief under the Defend Trade Secrets Act (the "DTSA") to recover its trade secrets that Doe took, to enjoin Doe from further use or dissemination of its intellectual property, and for damages caused by Doe's violations of the DTSA, his misappropriation of trade secrets, and his breach of his Fair Competition and Return of Company Property Agreements.

## THE PARTIES

8. MMA is a Delaware corporation with a principal place of business at 360 Park Avenue South, New York, New York 10010. It is a wholly-owned subsidiary of Ipsos America, Inc., a Delaware corporation, which also has its principal place of business at that address. Ipsos America, Inc. is a subsidiary of Ipsos S.A., a publicly traded French company.

9. MMA is a leading provider of unified marketing and business optimization services for Fortune 500 companies and global brands. Through cutting edge data management, analytics, and proprietary software, MMA helps its clients, among other things, to measure the effectiveness of their marketing programs, enabling them to achieve their financial targets through optimization of their sales, marketing and operational investments, increase brand loyalty, and strengthen their ability to convert new customers and build stronger relationships with their current customers.

10. Defendant Doe is an ▓▓▓ national residing in ▓▓▓▓▓▓. He originally began working for MMA 10 years ago in ▓▓. He moved to the US six years ago after MMA sponsored him for a "green" card.

## JURISDICTION AND VENUE

11. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, because this action seeks to enforce rights and remedies secured under the DTSA, 18 U.S.C. §§ 1836, *et seq.*

12. MMA invokes the supplemental jurisdiction of this Court over its claims arising under New York law, pursuant to 28 U.S.C. § 1367(a).

13. Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claim occurred in this judicial district.

14. Venue is also proper because Doe and MMA are parties to a March 20, 2020 Fair Competition Agreement, which provides:

> This Agreement shall be governed by and construed in accordance with the laws of the State of New York. You hereby irrevocably consent to exclusive personal jurisdiction and venue in the state and federal courts in the State of New York, County of New York, for the purpose of any legal proceeding relating to or arising hereunder this Agreement.

The Fair Competition Agreement contains several provisions requiring Doe to keep confidential MMA's trade secrets, and to return all MMA property upon the termination of his

employment. Accordingly, this legal proceeding relates to and arises out of the Fair Competition Agreement.

## FACTUAL ALLEGATIONS

### Doe's Employment with MMA and His Fair Competition Agreement

15. Doe was employed by MMA (and its predecessor companies) from ▒ 2011 through September ▒, 2021.

16. He worked in MMA's ▒ office from 2011 until he moved to the United States and began to work for MMA in its New York City office on ▒, 2015. In connection with this move, MMA assisted Doe and his wife in obtaining lawful permanent resident status, i.e., a green card, and paid all associated costs, totaling more than $20,000.

17. MMA invested heavily in Doe's professional development over the course of the ten years he worked for MMA and MMA promoted him several times. When he started in ▒, he was an Assistant Manager. When he began work in New York, his title was Manager. In ▒ 2016, he was promoted to Senior Manager. And effective ▒ 2020, he was promoted again to ▒. Through the promotions and otherwise, Doe's salary was almost doubled in the roughly 5 2/3 years he worked in MMA's New York office.

18. As MMA's Director of Analytics, Doe was responsible for leading projects for clients from start to finish. He led teams in data collection and validation, model specification and development, simulations, and then providing insights and recommendations to clients.

19. Doe was entrusted with numerous highly confidential trade secrets throughout his time with MMA, including content core to MMA's new initiatives over the last year. Some of MMA's most confidential documents include Microsoft Excel files that contain its formulas for its proprietary transformations, simulations, and optimizations. Doe had a high

4

degree of technical computer skills such that he could both read and understand MMA's analytic coding language, as well as uncover and utilize the formulas underlying MMA's Excel models.

20. In connection with his 2020 promotion, Doe executed a Fair Competition Agreement.[1] The Fair Competition Agreement contains, among other things, a covenant not to compete (the "Non-Compete"), which prohibits Doe from working for a competitor of MMA for one year after the termination of his employment, unless MMA elects to waive or modify the restriction. See Ex. 1, § 5. Very significantly, during that year, in order to exercise the Non-Compete, except in the event of a termination for cause, MMA is required to pay Doe his *full* base salary. *Id.* § 5(d)

21. Further, Doe was also required, pursuant to section 5(e) of the Fair Competition Agreement, to provide at least two weeks advance written notice if, at the time of the termination of his employment, he intended to "work for any business which in any way touches on, is related to, or competes with the business of the Company."

22. Moreover, pursuant to section 6 of the Fair Competition Agreement, Doe agreed that he would not directly or indirectly solicit or perform competing services for actual or prospective MMA clients, nor would he assist anyone in competition with MMA to solicit or service any actual or prospective MMA client. *Id*. § 6.

23. In section 4 of the Fair Competition Agreement, Doe also agreed that he would preserve and maintain the confidential and proprietary nature of MMA's trade secrets and know-how that he was privy to during his employment – as well as the confidential information provided to MMA by its clients. Specifically, Doe agreed that:

> Confidential Information. You also acknowledge that during the course of your employment, you will have access to information relating to the

---

[1] Doe had also executed similar agreements prior to the 2020 Fair Competition Agreement.

> Company's business that provides the Company with a competitive advantage, that is unique and novel to the Company, that is not generally known outside the Company, that could not easily be determined or learned by someone outside the Company and that the Company has taken steps to protect, or that is disclosed to you only in strict confidence, including, without limitation, trade secrets used, developed or acquired by the Company in connection with its business ("Confidential Information"). Such Confidential Information, whether or not explicitly designated as confidential, includes both written information and information not reduced to writing, and includes information and unique proprietary knowledge of the identity, characteristics, and preferences of the Company's Clients (including Client Confidences), internal corporate policies and strategies, pricing, financial and sales information, forecasts, and business and marketing plans. You acknowledge that the Company at all times retains ownership and control of its Confidential Information, that unauthorized use or disclosure of Confidential Information will damage the Company's business, and that the restrictions contained in this Agreement relating to Confidential Information are reasonable and necessary for the protection of the Company's legitimate business interests.
>
> <u>Duty to Preserve Client Confidences and Confidential Information</u>. You agree not to use or disclose, without the prior written consent of the Company, both during and after your employment with the Company, Client Confidences or Confidential Information, except as may be necessary in the good faith performance of your employment duties to the Company.

*Id.* §§ 5(b) and 5(c).

24.   In addition, Doe was obligated, pursuant to sections 2(a) and (b) of the Fair Competition Agreement, to return "all original and copies of documents (including those considered to be intellectual property), software and any other information-storing medium belonging to the Company and any other property belonging to the Company or belonging to any third party who has provided the property to the Company for its use and which is in your possession or under your control." He agreed to cooperate "with any request made by the Company either during or after the termination of [his] employment to provide access (including passwords and any codes) to any computer or other equipment (electronic or otherwise) in [his] possession or under [his] control, which contains information relating to the Company or its business."

25. Similarly, in section 4(d) of the Fair Competition Agreement, Doe agreed that all documents he received, created, or used were MMA confidential information and that he would return all such documents, unless asked to delete them:

> You acknowledge that all documents, in hard copy or electronic form, received, created or used by you in connection with your employment with the Company are and will remain the property of the Company and constitute Confidential Information. You agree to return and/or cooperate in permanently deleting all such documents (including all copies) promptly upon the termination of your employment and agree that during or after your employment, you will not, under any circumstances, without the written consent of the Company, disclose those documents to anyone outside the Company or use those documents for any purpose other than the advancement of the Company's interests.

26. Doe expressly agreed and acknowledged in section 9(f) of the Fair Competition Agreement that the restrictions contained therein "are fair, reasonable and necessary for the protection of the legitimate business interests of the Company and that the Company will suffer irreparable harm in the event of any actual or threatened breach." Accordingly, Doe consented to "the entry of a restraining order, preliminary injunction or other preliminary, provisional or permanent court order to enforce [the] Agreement and expressly waive[d] any security that might otherwise be required in connection with such relief."

27. The Fair Competition Agreement also provides in section 9(l) that "[a]ll rights and obligations under this Agreement which by their nature or their terms should survive will remain in effect after any termination or expiration of this Agreement."

**Doe Announces His Resignation and Misleads MMA as to where He Intended to Work**

28. On August 23, 2021, Doe provided notice that he was resigning from MMA. He stated that he was willing to serve a two-week notice period to provide a "seamless transition," and that his last day would be September 8.

29. On August 24, MMA's Chief People Officer, Liz Osterhus, asked Doe to advise the company whether he planned to join a competitor or a client and reminded him that he was obligated under the Fair Competition Agreement to give MMA two weeks' notice if he intended to go to a competitor. He responded later that evening, stating, "I haven't fully decided yet where I'll join next."

30. On September 2, Doe told Osterhus and Todd Gustafson, MMA's Executive Vice President of Analytics, during a telephone call that he still hadn't made up his mind where he intended to go after he left MMA, but that he was considering one company, Neustar, which was a competitor, and four others, including CVS Health, which were not competitors.

31. During his exit interview on September 8, he told Osterhus that he was continuing to decide where he intended to work, and mentioned Neustar again, as well as two client-side entities, including CVS Health, stating that he was waiting to hear from CVS Health before making a final decision, and implying that he was most likely to join a client, as opposed to a competitor. He indicated that he needed to take time off to consider his options before deciding where to go next.

32. On September 14, Osterhus emailed Doe and asked him if he had decided where he would be working and asked him to advise MMA if he planned to join Neustar or another MMA competitor. On September 20, he responded, stating, "I have decided to join ███████ ███."

33. ████████████ is MMA's most direct competitor. Accordingly, that same day, MMA sent a letter to Doe informing him that it was exercising the Non-Compete in the Fair Competition Agreement, that he would not be allowed to join ████████████ for a period of one

8

year from his last day at MMA, and that MMA would pay him his most recent base salary during that year. MMA also advised Doe to preserve all potentially relevant evidence.

34. Doe informed MMA on September 23, through counsel, that he would not be employed by ▮▮▮▮▮▮.

35. A forensic examination of Doe's computer has revealed that he received an offer to join ▮▮▮▮▮▮ no later than August 13 and that he signed his offer letter with ▮▮▮▮▮▮ on Friday, August 20. And, as stated above, he provided notice to MMA of his resignation the next business day – Monday, August 23. Thus, the evidence demonstrates that Doe lied to MMA for nearly a month before he told MMA that he intended to join ▮▮▮▮▮▮.

36. Beyond Doe's false statement to MMA about his intended employment, his two-week notice period was riddled with problems. Despite promising a "seamless transition," he refused to make himself available for a transition call with a client and generally made things very difficult for MMA in trying to transition his work to other employees. He also took a vacation day and refused to work for a certain amount of time until MMA agreed to allow him to keep the phone number associated with his company mobile phone, despite having signed an agreement providing that the number was MMA property.

37. As part of the normal process after an employee provides a notice of resignation, Osterhus sent Doe a "Return of Company Property" letter agreement on August 25, informing him that he "must return all property belonging to MMA no later than his last day, September 8, 2021, including:

    a. Customer lists, whether written, on printouts or on disk.

    b. Financial and accounting information; work papers; notes; books; journals; reports; invoices; vendor invoices; billing records.

  c. Price lists; confidential account information; any data that has been sent electronically between Ipsos MMA, Inc. or any of its affiliated entities ("Ipsos") and its accounts or customers and vendors. All Reports – Ups and Downs; monthly volume and generic purchases. Ipsos Customer/Account Aging Reports; Promise List – Discount Changes, Ipsos Routing Sheets.

  d. Telephone cards; credit cards; gas cards; security passes; office; building; desk keys; laptop computers; cell phones; beepers; pagers; phone directories; electronic account information codes.

  e. All tangible and intangible property belonging to Ipsos or relating to your employment with Ipsos."

On August 30, Doe executed the letter, and "certif[ied] that [he has] not retained any copies, electronic or otherwise, of any Ipsos property."

38. On September 10, Doe sent to MMA his company-issued laptop computer and mobile phone. Both were immediately stored upon receipt on September 13, and not opened until they were provided to Stroz Friedberg, the forensic investigation firm, for analysis. Doe did not return any other documents, materials, or devices to MMA then or since.

**The Files Doe Misappropriated**

39. The forensic examination revealed that Doe took dozens of MMA files, including numerous documents from MMA's "Knowledge Repository," including training materials, files to reference and use in manual simulations for clients, and files to use to develop various models. Specifically, the files that Doe took from MMA include:

- "▇ - Core Attribution - APL Ranges_20190625.xlsx." This file provides the testing framework for a circular (flyers that, e.g., come in a Sunday newspaper, or appear online) in order for clients to maximize the effectiveness of each page in the circular.

- "CarryForwardMultiplier.xlsx." This file contains formulas used to predict a client's future sales volumes.

- "03_100_Transformations – Media," which is a folder containing three files ("PVALs_Lunch&Learn_20140508.xlsx," Transformations Deck.pptx," and

"APL Example_v1.00.xlsx") that MMA uses internally to explain how MMA transforms data to be used for modeling purposes.

- "MultiplicativeModels_v4_Short_POSTED.pdf," which is a document developed by MMA on non-linear models, which are more complex and account for synergies in marketing spend (i.e., so marketing tactics work together to create an impact that is greater than the sum of its parts). With this document, a competitor could gain insights into how MMA makes decisions on which models to use, and why MMA would use them.

- "The Bootstrap_MMA.pdf," which is a full training deck on resampling methodology, and how/when to apply it. With this document, a competitor could gain insights into MMA's modeling form decision making and methodology.

- "00_001_Training Decks," which is a folder containing several documents ("Project Training - Full Presentation_v1.00_20200120.pptx," "Using Excel Well and Cleanly 10-22-2019.pptx,", and "Building an Effective Presentation Training 12-21-16.pptx"). These are training files for MMA's teams on how it collects data, validates, builds models, simulates, optimizes, and how and why in all cases.

- "04_001_Optimization," which is a folder containing several documents ("MMA - Curve Builder and Optimizer Tools_v1.00_20200225.pptx," "MROIs_Curve_Generator_(APL-PVAL) - V3.1.xlsm," "MROIs_Curve_Generator_(APL-PVAL) - V3.1_protected.xlsm OptimizerV_3.1.xlsm," and "Excel-based MROI Curve Builder and Op. . . - Wednesday, February 26, 2020 12.04.07 PM.mp4"). These files are (i) training on MMA's optimization engine, (ii) the files used to run optimizations for clients, and (iii) the curve generator on which the optimizations run. The optimizations provide investment recommendations for MMA's clients to improve their marketing efficiency.

- "03_101_Elasticity," which is a folder containing a file called "[redacted] - CA - Base Variable Review_20191119.xlsx." This file includes the framework to be able to run pricing models and the acceptable ranges for output.

- "03_101_Elasticity," which is a folder containing a file called "[redacted] 2018 rebuild - Seasonality and Trend Calculation_Example_1.00_20190606.xlsx," which contains the information needed to create any seasonality that MMA utilizes for modeling purposes.[2]

---

[2] The evidence reveals that [Doe] placed numerous other MMA files on USB drives, which he also did not return to MMA. For example, in a folder labeled "Ipsos\Statistical Topics," [Doe] placed files called "MMA_PVAL to APL tool v.10.xlsx" and "MMA 101 – EMEA 4-10-19.pptx." In a folder labeled "Ipsos\Attribution," [Doe] placed a file called

11

40. Doe also appears to have taken files that contain highly confidential client data in violation of the Fair Competition Agreement. For example, he appears to have taken a file named "███████_Ipsos MMA_Q3 Q4 '20_Final Results_06 10 21_v1.xlsb." Although it is not entirely clear, because we cannot find the original file on MMA's system, this file likely contains client model results, which would necessarily have client confidential data therein.

**The Files Doe Misappropriated Are Trade Secrets**

41. MMA has invested millions of dollars and extensive employee resources into the development of the files that Doe took. These files contain the formulas and methodologies. They include analytic transformations, MMA's unique means of providing clients with solutions to their digital attribution challenges in a holistic manner, and MMA's means of optimizing the results, which allow its clients to make high stakes financial investment decisions. They include the transformations MMA uses to sort through thousands of scenarios to get the best investment scenarios for its clients, the cutting-edge methodologies it deploys for marketing mix modeling, attribution, testing and pricing, and proprietary calculations it uses for many of these feature services. If a competitor were to be given access to these files, they would have complete insight into MMA's end-to-end process, and they would learn – and be able to replicate – much of the "secret sauce" that has led to MMA's competitive advantage in the industry.

42. The files Doe took are essential to MMA's work.

---

"MTA Training Part I – presentation.pdf." He also took a document called "Important Excel Calcs." MMA has yet to find such documents on its system. Amongst the potential reasons for this are (i) these documents were created locally on Doe's company-issued laptop and were not saved on MMA's servers, (ii) they reside on MMA's servers, but have not yet been located because they were saved on Doe's USB drives in different folder structures than what appears on MMA's system, or (iii) he deleted the files from MMA's system. At this point in the investigation, MMA does not know.

43. The files are highly proprietary and confidential and are extremely valuable trade secrets.

44. The files are extremely valuable not only because of the significant time, money, and know-how that they contain, but also because they have been proven to be highly successful at helping MMA optimize its clients' marketing programs, which in turn has helped MMA to be the market leader in its industry and to have won all 15 qualified RFPs in which it has participated during 2021.

45. The files derive their value, and provide MMA with a competitive advantage, by virtue of their secrecy.

46. MMA is careful to maintain and protect that secrecy, and has not licensed the files to any other entity; nor has it disclosed the files to anyone outside of MMA. It takes the security of these files seriously and limits access to the shared directories from which Doe took the files by, among other things, the use of software that only allows access to MMA employees who have been specifically provided permission to access those directories on MMA's servers. Further, employees are required to log on to MMA's system using a company-issued computer and their username and password in order to access these documents. Additionally, like Doe, all of MMA's employees are required to sign non-disclosure agreements as a condition of employment.

**Doe Wiped the Company-Issued Mobile Phone in Breach of His Fair Competition and Return of Company Property Letter Agreements**

47. The forensic examination also revealed that Doe, in direct violation of the terms of his Fair Competition and Return of Company Property Letter Agreements, performed a "factory reset" on the company-issued mobile phone before he returned it to MMA, which made it impossible to obtain any of the data on the phone.

## COUNT I

### VIOLATION OF THE DEFEND TRADE SECRETS ACT
### 18 U.S.C. § 1836, *ET SEQ.*

48. MMA repeats, re-alleges and incorporates by reference paragraphs 1 through 47 above as if set forth fully herein.

49. As set forth above, MMA has various trade secrets critical to the success of its business, including, without limitation, the files listed in paragraphs [38 and 39] above, which contain "trade secrets" within the meaning of the DTSA, 18 U.S.C. § 1839(3).

50. These trade secrets are essential to MMA's products and services.

51. MMA invested significant time and resources to develop the trade secrets, which derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

52. MMA has taken steps and made efforts that are reasonable under the circumstances to maintain the secrecy of its trade secrets by, among other things, requiring employees to enter into written confidentiality agreements and limiting the individuals to whom its trade secrets are disclosed; namely, to include only certain individuals employed by MMA who have a legitimate need to access the confidential information.

53. Doe misappropriated MMA's trade secrets while knowing he was under an obligation not to take them for personal use or disclose them.

54. Doe's misappropriation of MMA's trade secrets was accomplished through improper means including, without limitation, copying files from MMA's network on to USB drives in violation of the Fair Competition Agreement.

55. Doe's actions as described herein constitute a misappropriation within the meaning of the DTSA, 18 U.S.C. § 1839(5).

56. Doe's actions have caused and will continue to cause damage to MMA and, unless restrained, will further damage MMA, the nature and extent of which may not be able to be proven with certainty, irreparably injuring MMA, leaving it without an adequate remedy at law.

57. MMA is entitled to damages as a result of Doe's misappropriation and/or violation of the DTSA, to the extent its actual losses are calculable. MMA may also or in the alternative be entitled to recover any gain or avoided costs realized by Doe or other third parties who have benefitted from the use of MMA's trade secrets, or a reasonable royalty.

58. Doe's misappropriation of MMA's trade secrets was willful and malicious, entitling MMA to exemplary damages of up to two times its actual damages, and to recover its legal fees.

59. Preliminary and permanent injunctive relief is necessary to prevent irreparable harm and further disclosure or use of MMA's trade secrets.

## COUNT II

**MISAPPROPRIATION OF TRADE SECRETS UNDER NEW YORK COMMON LAW**

60. MMA repeats, re-alleges and incorporates by reference paragraphs 1 through 59 above as if set forth fully herein.

61. As set forth above, MMA has various trade secrets critical to the success of its business, including, without limitation, the files listed in paragraphs [38 and 39] above, which contain "trade secrets" under New York law.

62. MMA invested significant time and resources to develop the trade secrets, which derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

63. MMA has taken steps and made efforts that are reasonable under the circumstances to maintain the secrecy of its trade secrets by, among other things, requiring employees to enter into written confidentiality agreements and limiting the individuals to whom its trade secrets are disclosed; namely, to include only certain individuals employed by MMA who have a legitimate need to access the confidential information.

64. Doe misappropriated MMA's trade secrets while knowing he was under an obligation not to take them for personal use or disclose them.

65. Doe's misappropriation of MMA's trade secrets was accomplished through improper means including, without limitation, copying files from MMA's network on to USB drives in violation of the Fair Competition Agreement.

66. Doe agreed in both the Fair Competition Agreement and the Return of Company Property Letter Agreement to return all such trade secrets at the conclusion of his employment with MMA but he breached both agreements by not returning the files.

67. Doe's actions have caused and will continue to cause damage to MMA and, unless restrained, will further damage MMA, the nature and extent of which may not be able to be proven with certainty, irreparably injuring MMA, leaving it without an adequate remedy at law. MMA is therefore entitled to injunctive relief to prevent such irreparable harm.

68. MMA is entitled to damages as a result of Doe's misappropriation to the extent its actual losses are calculable.

## COUNT III

## BREACH OF CONTRACT

69. MMA repeats, re-alleges and incorporates by reference paragraphs 1 through 68 above as if set forth fully herein.

70. The Fair Competition Agreement and the Return of Company Property Letter Agreement are valid, binding and enforceable, and MMA has performed all of its obligations thereunder.

71. In the Fair Competition Agreement, Doe agreed to always preserve and maintain the confidential and proprietary nature of MMA's non-public information and know-how that he was privy to during his employment.

72. In both the Fair Competition Agreement and the Return of Company Property Letter Agreement, Doe agreed to return all MMA property to MMA at the conclusion of his employment with MMA.

73. Doe has breached the terms of the two agreements by copying MMA's confidential trade secret files, as well as files that contain client confidential information on them, on to external USB drives and not returning them to MMA at the conclusion of his employment with MMA.

74. Doe also breached both agreements by deleting all of the data off of his MMA mobile phone before returning the phone to MMA.

75. As a proximate cause of Doe's breaches of the Fair Competition Agreement and the Return of Company Property Letter Agreement, MMA has suffered, and will continue to suffer, damages. Further, if Doe is not enjoined from further violations of the agreements, MMA will suffer irreparable injury.

**PRAYER FOR RELIEF**

MMA reserves the right to pursue any and all available remedies against Doe, including damages, punitive damages, exemplary damages, statutory damages, attorneys' fees, and any equitable remedies including an order of seizure, a temporary restraining order, a preliminary injunction, a permanent injunction, and other available remedies necessary to prevent propagation or dissemination of MMA's trade secrets.

**WHEREFORE**, MMA respectfully requests that the Court:

I. Grant an *ex parte* seizure order instructing the U.S. Marshals Service to seize all of Doe's computing and computing storage devices, tangible or intangible, including but not limited to all computers (desktops and laptops), mobile devices, USB flash drives, external hard drives, and cloud storage service login credentials (including, but not limited to, iCloud and Google Drive), at his home, which is, on information and belief, located at ▮▮▮▮▮;

II. Grant an *ex parte* temporary restraining order against Doe, (i) requiring him to turn over all copies of MMA's confidential information and trade secrets, in all locations and on all media on which they may reside (e.g., on computers, mobile devices, tablets, USB flash drives, external hard drives, or in cloud storage, such as Google Drive, iCloud, etc.), including but not limited to ▮▮▮▮▮, in order for MMA to analyze such devices and storage media to ensure that there are no additional copies of its Trade Secrets or other confidential information, (ii) enjoining him from further misappropriation, dissemination and use of MMA's trade secret and other confidential information, and (iii) enjoining

18

him from destroying any evidence of misappropriation or of subsequent use or dissemination of the MMA trade secrets or other confidential information;

III. Enter a judgment that Doe has:

  a. Violated the DTSA;

  b. Misappropriated MMA's trade secrets; and

  c. Breached his Fair Competition Agreement and Return of Company Property Letter Agreement.

IV. Enter a judgment that Doe's violations and breaches were willful and malicious;

V. Find that Doe can have no benefit as a result of his misappropriation and wrongful acts;

VI. Find that, due to Doe's violations and breaches, MMA is not required to make any Non-Compete payments to Doe under the Fair Competition Agreement; and

VII. Award MMA:

  a. Compensatory and other damages in amounts to be determined at trial;

  b. Exemplary damages;

  c. Attorneys' fees;

  d. Costs of this litigation; and

  e. Such other legal and equitable relief as this Court deems proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, MMA respectfully demands a trial by jury of all issues so triable.

Dated: New York, New York
October 28, 2021

PROSKAUER ROSE LLP

*[signature]*

Steven M. Kayman
Jordan B. Leader
William G. Fassuliotis
Eleven Times Square
New York, New York 10036-8299
212.969.3000
skayman@proskauer.com
jleader@proskauer.com
wfassuliotis@proskauer.com

*Attorneys for Plaintiff Ipsos MMA, Inc.*

20