## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

IPSOS MMA, INC.,

                Plaintiff,

    - against -

      JOHN DOE,

                Defendant.

Case No. 21-cv-8929

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS APPLICATION FOR EX PARTE SEIZURE AND TEMPORARY RESTRAINING ORDERS

Steven M. Kayman
Jordan B. Leader
William G. Fassuliotis
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, New York 10036
Phone: (212) 969-3430
Fax: (212) 969-2900
skayman@proskauer.com
jleader@proskauer.com
wfassuliotis@proskauer.com

*Attorneys for Ipsos MMA, Inc.*

October 28, 2021

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF RELEVANT FACTS ................................................................. 3

ARGUMENT .......................................................................................................... 7

I.  *Ex Parte* Seizure of Doe's Computer(s) and Electronic Storage Devices
and Platforms Is Appropriate and Warranted ................................................ 7

    A.  Alternate Forms of Equitable Relief Would Be Inadequate.................... 8

    B.  MMA Will Suffer Immediate and Irreparable Injury Without Seizure.................. 10

    C.  The Balance of Harms Weights Heavily in Favor of Seizure ................ 11

    D.  MMA Is Likely to Succeed on its DTSA Claim ................................. 13

        1.  MMA's copied files are trade secrets......................................... 13

        2.  Doe misappropriated the Trade Secrets by improper means ............. 15

    E.  Doe Has Actual Possession of the Trade Secrets and the Property to be
Seized ............................................................................................ 16

    F.  The Seizure would be Limited to Particular Matters in a Specific Location ........ 16

    G.  There Is Substantial Risk that Doe Will Destroy or Conceal the Evidence
of His Misconduct .......................................................................... 17

    H.  MMA Has Not Publicized Its Request ............................................. 17

II.  An Ex Parte Temporary Restraining Order Is Also Needed to Ensure the
Recovery of MMA's Trade Secrets and to Prevent Doe from Further
Disseminating Them or Destroying Evidence ............................................ 17

CONCLUSION.................................................................................................... 20

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*AFA Dispensing Grp. B.V. v. Anheuser-Busch, Inc.*,
    740 F. Supp. 2d 465 (S.D.N.Y. 2010) ...................................................................18

*AUA Priv. Equity Partners, LLC v. Soto*,
    No. 1:17-CV-8035-GHW, 2018 WL 1684339 (S.D.N.Y. Apr. 5, 2018) ..............15

*AVX Corp. v. Kim*,
    No. CV 6:17-00624-MGL, 2017 WL 11316598 (D.S.C. Mar. 13, 2017) ..............12

*Axis Steel Detailing, Inc. v. Prilex Detailing LLC*,
    No. 2:17-CV-00428-JNP, 2017 WL 8947964 (D. Utah June 29, 2017) ...........9, 11

*Belth v. Ins. Dep't*,
    95 Misc. 2d 18, 406 N.Y.S.2d 649 (Sup. Ct. 1977) ...............................................14

*Benihana, Inc. v. Benihana of Tokyo, LLC*,
    784 F.3d 887 (2d Cir. 2015) .............................................................................18, 20

*Blue Star Land Servs. v. Coleman*,
    No. CV-17-931-C, 2017 WL 11309528 (W.D. Okla. Aug. 31, 2017) ..................8, 9

*Broker Genius, Inc. v. Zalta*,
    280 F. Supp. 3d 495 (S.D.N.Y. 2017) ...................................................................13

*Capstone Logistics Holdings, Inc. v. Navarrete*,
    No. 17-CV-4819 (GBD), 2018 WL 6786338 (S.D.N.Y. Oct. 25, 2018) .................19

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
    559 F.3d 110 (2d Cir. 2009) ..........................................................................10, 19

*FMC Corp. v. Taiwan Tainan Giant Indus. Co.*,
    730 F.2d 61 (2d Cir. 1984) ...................................................................................10

*Intertek Testing Servs., N.A., Inc. v. Pennisi*,
    443 F.Supp.3d 303 (E.D.N.Y. 2020) ....................................................................20

*Invesco Institutional (N.A.), Inc. v. Deutsche Inv. Mgmt. Ams., Inc.*,
    74 A.D.3d 696, 904 N.Y.S.2d 46 (1st Dep't 2010) ...............................................14

*JP Morgan Chase v. J.H. Elec. of N.Y., Inc.*,
    69 A.D.3d 802, 893 N.Y.S.2d 237 (2010) .............................................................19

*KCG Holdings, Inc. v. Khandekar*,
    No. 17-CV-3533 (AJN), 2020 WL 1189302 (S.D.N.Y. Mar. 12, 2020) .........................13, 15

*Lumenate Techs., LP v. Integrated Data Storage, LLC*,
    No. 13-CV-3767, 2013 WL 5974731 (N.D. Ill. Nov. 11, 2013) .............................................16

*Mazak Optonics Corp. v. Marlette*,
    No. 17 C 1023, 2017 WL 3394727 (N.D. Ill. Aug. 8, 2017)..................................................20

*Mickey's Linen v. Fischer*,
    No. 17 C 2154, 2017 U.S. Dist. LEXIS 145513 (N.D. Ill. Sept. 8, 2017).............................12

*Mission Cap. Advisors LLC v. Romaka*,
    No. 16 CIV. 5878 (LLS), 2016 WL 11517104 (S.D.N.Y. July 29, 2016) ..............................12

*Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*,
    118 F.3d 955 (2d Cir. 1997)..................................................................................................14

*Solar Connect, LLC v. Endicott*,
    No. 2:17-CV-1235, 2018 WL 2386066 (D. Utah Apr. 6, 2018)................................................9

*Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*,
    No. 15 CIV. 211 (LGS), 2021 WL 1553926 (S.D.N.Y. Apr. 20, 2021)................................13

*Tradescape.com v. Shivaram*,
    77 F. Supp. 2d 408 (S.D.N.Y. 1999)......................................................................................14

## STATUTES

18 U.S.C. § 1836(b) ................................................................................................... passim

18 U.S.C. § 1839................................................................................................................13, 15

## OTHER AUTHORITIES

Fed. R. Civ. P. 65 ....................................................................................................... passim

H.R. Rep. No. 114-529 (2016)............................................................................................7, 8

Pub. L. No. 114-153, § 5 (2016) ..............................................................................................7

Plaintiff Ipsos MMA, Inc. ("MMA") hereby submits this memorandum of law in support of its application for a civil seizure order under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b)(2), and for a temporary restraining order ("TRO") under Rule 65 of the Federal Rules of Civil Procedure.  Because of the severe harm it would likely suffer if Defendant John Doe is given notice of this case or application, MMA seeks this relief *ex parte*.

## PRELIMINARY STATEMENT

MMA's former employee, Defendant John Doe, in violation of the law and his contract, took MMA's valuable trade secrets.  MMA wants them back.  MMA also wants to make sure that Doe cannot benefit from his misappropriation by using the trade secrets, monetizing them, or disclosing them to others.  Critically, there is every reason to fear that, if Doe is given notice that MMA is aware of his misappropriation, he will destroy evidence, conceal or make further copies of the trade secrets, or otherwise cover his tracks.  The DTSA provides a remedy intended for precisely this kind of a situation:  *ex parte* civil seizure.

Doe worked at MMA for ten years, rising through the ranks until he reached the position of ███████████.  In his employment contract, Doe agreed to various restrictions befitting the sensitive nature of his employment, including a non-compete agreement and various confidentiality restrictions.  While employed at MMA, Doe received an offer of employment from ██████████, MMA's principal competitor.  Doe then copied the trade secrets from MMA's servers to at least one USB device.  Mere days later, Doe accepted the offer of employment.  On the Monday after accepting the offer, Doe announced to MMA he was resigning from the company, though not that he intended to leave for ███████.  As part of his agreement, Doe was required to tell MMA if he intended to go to a competitor so MMA could have an opportunity to decide whether to enforce its *fully paid* non-compete

provision.  Over a period of weeks, MMA asked ██Doe██ at least four times about his future employment.  His first three answers were coy, listing possible opportunities, but not ████████ ████████. Finally, six days after MMA's last ask – and a month after he announced his resignation – ██Doe██ for the first time told MMA he intended to join ████████████.

Immediately after, MMA sent notice to ██Doe██ that it was exercising its right to "buy" the non-compete.  MMA also hired external forensics experts to analyze his work electronics for malfeasance.  The analysis confirmed MMA's worst fears: ██Doe██ took MMA's trade secrets. The trade secrets include algorithms and other predictive models to help MMA's clients – many of which are well known companies – predict future demand and understand what marketing strategies and tactics will be most effective (the "Trade Secrets").  These Trade Secrets have been critical to MMA's extraordinary success during the pandemic.  Were a competitor to obtain these Trade Secrets, MMA would lose its competitive edge.

To the best of its knowledge, however, MMA does maintain one current advantage over ██Doe██: he is unaware that MMA has discovered his misconduct.  With the aid of its forensic expert, MMA identified ██Doe's██ transgressions and has held closely the facts surrounding its discovery.  MMA thus brings this *ex parte* application to maximize its chances of fully recovering its Trade Secrets and discovering what copies and use ██Doe██ has made of them.  While the relief MMA seeks is extraordinary, it meets all eight requirements set out by the DTSA, as detailed below.

In addition to its application for seizure, MMA requests a supporting TRO to prevent ██Doe██ from destroying any evidence of his misconduct that may not be recovered through seizure and to ensure that ██Doe██ cannot further disseminate MMA's Trade Secrets, wherever he may have placed them.  In particular, MMA is seeking an order of seizure only for computers,

mobile phones, and other storage media located in    Doe's    home in ███████████, where

MMA believes it is most likely the Trade Secrets are physically kept.  MMA has reason to believe,

however, that data relating to the Trade Secrets was also backed up on the cloud or other non-

physical media.  Thus, the requested TRO is necessary to provide some measure of protection if

the Trade Secrets are also maintained elsewhere or on some electronic platform that is not found

or accessible at the time of the seizure.

        Doe's    dishonesty and proficiency with computer technology strongly suggest that

any advance notice to    Doe    would pose a tremendous risk that he will destroy the evidence

of what he has done with MMA's intellectual property.  MMA is also concerned that he has

significant business contacts in ████ and might try to transfer MMA's Trade Secrets to an ████

competitor.  Without seizure and temporary restraining orders, MMA may never be able to

determine who has possession of the Trade Secrets.

        These extraordinary circumstances fully warrant the relief MMA requests.

## STATEMENT OF RELEVANT FACTS

        The facts are fully set forth in the accompanying declarations of (i) Patrick Cummings,

Chief Executive Officer of Ipsos MMA, Inc. (the "Cummings Decl."); (ii) Elizabeth Osterhus,

Chief People Officer of Ipsos MMA, Inc. (the "Osterhus Decl."); (iii) Charles Wille, Manager of

Stroz Friedberg (the "Wille Decl."), and the Declaration of Steven M. Kayman ("Kayman Decl.").

In the interests of brevity, MMA does not repeat what is said in those declarations in full herein,

but provides a brief overview and incorporates pertinent facts in the arguments that follow.

        MMA is a leading provider of unified marketing and business optimization services for

Fortune 500 companies and global brands.  (Cummings Decl. ¶ 4.)  Through cutting edge data

management, analytics, and proprietary software, MMA helps its clients, among other things, to

3

measure the effectiveness of their marketing programs, enabling them to achieve their financial targets through optimization of their sales, marketing and operational investments, increase brand loyalty, and strengthen their ability to convert new customers and build stronger relationships with their current customers. *Id.*

In 2011, John Doe , an ████ national, was hired as an Assistant Manager in MMA's ████████ office. (Cummings Decl. ¶ 8.) MMA promoted Doe multiple times, including a promotion to Manager on ██████, 2015. (Osterhus Decl. ¶ 5; Cummings Decl. ¶ 8.) As part of this promotion, Doe moved from ████ to MMA's New York office. (Osterhus Decl. ¶ 5.) In connection with his move, MMA assisted Doe and his wife to obtain lawful permanent resident status and paid all associated costs. (*Id.*) MMA promoted Doe twice more, to Senior Manager in ██ 2016, and ████████████ effective ███ 2020. (*Id.* ¶ 6.)

After MMA promoted him ████████, Doe agreed to and executed a Fair Competition Agreement. (*Id.* ¶ 7 & Ex. 1) The agreement includes a covenant not to compete (the "Non-Compete"; *Id*. & Ex. 1., § 5.) The Non-Compete, if exercised, prohibits Doe from working for a competitor of MMA for one year after leaving MMA, conditioned on MMA paying Doe his full base salary for the duration of the Non-Compete period. (*Id.*) The agreement also includes detailed confidentiality requirements, including agreeing to preserve and maintain the confidential and proprietary nature of MMA's Trade Secrets. (*Id.* ¶ 10 & Ex. 1., §§ 4, 5(b)-(c).) Doe also agreed to return all company property, including electronic documents, to MMA in the event of his termination. (*Id.* ¶¶ 11-12 & Ex. 1., §§ 2(a)-(b), 4(d).)

On August 23, 2021, Doe informed MMA he was resigning. (*Id.* ¶ 15.) Despite promising a "seamless transition" during his two week notice period, his actual actions created

problems for MMA.  (*Id.* ¶ 23; Cummings Decl. ¶ 10.)  Doe  took a vacation day during the middle of this period and refused to work until MMA agreed to transfer his business mobile phone number to a personal phone, despite signing an agreement that the number was MMA property. (Osterhus Decl. ¶ 23.)  Doe  refused to make himself available for a transition call with a client, nor did he fully cooperate in transitioning his work to other employees.  (*Id.*)  On September 10, and after his official last day at MMA,  Doe  returned his company-issued laptop and mobile phone.  (*Id.* ¶ 25.)

During this period, MMA asked  Doe  at least four times about his future employment plans.  (*Id.* ¶¶ 16-19.)  Doe  gave multiple answers, stating at first he had not "fully decided yet."  (*Id.* ¶ 16.)  He then identified five potential employers, including one competitor.  (*Id.* ¶ 17.) After MMA's last inquiry sent by email on September 14, 2020,  Doe  responded six days later, on September 20, that he was joining ███████████, MMA's principal competitor.  (*Id.* ¶ 20.)  This was the first time  Doe  mentioned ███████████ as a possibility.

In actuality,  Doe  had already accepted an offer of employment from ███████ ███████ while still employed by MMA and before giving his two weeks' notice.  (Wille Decl. ¶¶ 17-20.)  He received the offer no later than August 13 (*Id.* ¶ 18) and accepted it on August 20 (Wille Decl. ¶ 19).  On August 17,  Doe  copied numerous files, including the "secret sauce" of MMA's Trade Secrets, on to at least one USB device.  (*Id.* ¶¶ 12-15; Cummings Decl. ¶ 13.)

However, MMA did not yet know either of these facts.  MMA quickly sent a letter to Doe  that it would exercise the Non-Compete to prevent  Doe  from joining ███████ ███████ for the year the Non-Compete was in effect.  Through a lawyer,  Doe  said he would abide by the non-compete.  MMA also hired outside experts to forensically analyze  Doe's

business electronic devices.  From this analysis, MMA learned    Doe    had lied about his employment plans and had copied MMA's Trade Secrets.

In accordance with the Fair Competition Agreement, MMA sent    Doe    a "Return of Company Property" letter informing    Doe    of his obligation to "return all property belong to MMA no later than his last day," including "[a]ll tangible and intangible property belonging to Ipsos or relating to your employment with Ipsos."  (Osterhus Decl. ¶ 24.)    Doe    executed the letter and "certif[ied]" he did not keep any Ipsos property.  (*Id.* & Ex. 2.)

Notwithstanding his "certification" and contractual requirements,    Doe    copied numerous documents from MMA's "Knowledge Repository," including MMA's highly confidential formulas and methodologies, training materials, files to reference and use in manual simulations for clients, and files to use to develop various models.  (Wille Decl. ¶¶ 12-15, Cummings Decl. ¶¶ 12-13.)  He also took files likely containing highly confidential client data.  (Cummings Decl. ¶ 16.)[1]  MMA took steps to protect their secrecy, including yearly security awareness training courses, and has not disclosed the files to anyone outside of MMA.  (*Id.* ¶¶ 17-18.)  MMA limits access to the files, including by giving permission to access the directories in which the files are located only to specific employees who need to access them to do their jobs.  (*Id.*)  Because of the limitations of the forensics analysis, it is possible    Doe    copied more information.  (Wille Decl. ¶¶ 26-29.)

These files are extremely valuable not only because of the significant time, money and know-how that they contain, but also because they have been proven to be highly successful at helping MMA enhance its clients' marketing programs.  (Cummings Decl. ¶ 13.)  Because of these

---

[1]    Doe    also deleted all data off of his work phone before returning it to MMA, but appears to have made a copy of the data on the Apple iCloud before doing so.  (Wille Decl. ¶¶ 21-22, 24-25.)

Trade Secrets, MMA is the market leader in its industry and was able to win all 15 qualified requests for proposals it participated in during 2021.  (*Id.* ¶ 5.)  The files are only valuable because of their secrecy.  Were competitors to gain access, it would eliminate or substantially lessen MMA's competitive advantage.  (*Id.* ¶ 13.)  And ██████████ is by no means MMA's only concern.  MMA is concerned that Doe has significant business contacts in ████ and could transfer MMA's Trade Secrets to an ████ competitor.  (*Id.* ¶ 14.)

## ARGUMENT

**I.   *Ex Parte* Seizure of Doe's Computer(s) and Electronic Storage Devices and Platforms Is Appropriate and Warranted**

"[T]rade secret cases often require swift action by courts across state lines to preserve evidence and keep a trade secret thief from boarding a plane and taking the secret beyond the reach of American law."  H.R. Rep. No. 114-529, at 4 (2016).  The title of the law itself – the Defend Trade Secrets Act – expresses the powerful Congressional purpose behind the legislation:  to protect the trade secrets of American companies.  *See* Pub. L. No. 114-153, § 5 (2016) ("It is the sense of Congress that – (1) trade secret theft occurs in the United States and around the world; [and] (2) trade secret theft, wherever it occurs, harms the companies that own the trade secrets and the employees of the companies[.]").

Signed into law by President Obama in 2016, after being passed almost unanimously by both the House and the Senate, the DTSA is intended to provide American businesses with powerful tools to fight the increasing risk they face of misappropriation of trade secrets by "thieves looking for a quick payday or to replicate the market-leading innovations . . . [and] know-how that has made American industry the envy of the world."  H.R. Rep. No. 114-529, at 3.  To accomplish those ends, the DTSA permits a court upon an *ex parte* application, in extraordinary circumstances, to order the "seizure of property necessary to prevent the propagation or dissemination of the trade

secret that is the subject of the action."  18 U.S.C. § 1836(b)(2)(A)(i).  In providing for this remedy, Congress specifically recognized that, given today's enormously competitive global market, American businesses "will lose their competitive edge if they cannot pursue and stop thieves looking to shortcut the innovative products, designs, and processes that have fueled our economy." H.R. Rep. No. 114-529, at 6.

Doe's  misappropriation of MMA's Trade Secrets are precisely the type of extraordinary circumstances that call for *ex parte* seizure to protect MMA from having its highly sensitive Trade Secrets potentially disseminated across the globe.  Specifically, there are eight statutory requirements the Court must consider in granting such an application.  18 U.S.C. § 1836(b)(2)(A)(ii); *see also, e.g.*, *Blue Star Land Servs. v. Coleman*, No. CV-17-931-C, 2017 WL 11309528, at *2 (W.D. Okla. Aug. 31, 2017) (listing the statutory requirements for ex parte seizure).  As shown below, the facts and circumstances of  Doe's  misappropriation of MMA's Trade Secrets clearly satisfy each of those enumerated requirements.

## A.    Alternate Forms of Equitable Relief Would Be Inadequate

In this case, an order pursuant to Rule 65 or another form of equitable relief, without a seizure of  Doe's  computers and other electronic storage devices, would be inadequate to safeguard MMA's Trade Secrets, as well as preserve the evidence of  Doe's  misappropriation and any actions he has taken to unlawfully disseminate the Trade Secrets in the U.S. or abroad. Doe  has a high degree of technical computer skills and can read and understand MMA's coding language and formulas.  (Cummings Decl. ¶ 9.)  Absent seizure, he will have the opportunity and incentive to wipe, alter, or otherwise destroy or conceal any evidence of his misconduct.  The likelihood that he will take such actions if alerted find support in  Doe's

previous misconduct – covertly stealing the Trade Secrets in the first place, lying about his intended employment and falsely representing that he had returned all company documents.

Courts considering the effectiveness of a Rule 65 injunction in contrast to an *ex parte* seizure under the DTSA have found that the very type of conduct        Doe        inarguably has engaged in, which evinces a likelihood of evasion, avoidance or other noncompliance with the law, weighs in favor of granting seizure under the DTSA.  *See Coleman*, 2017 WL 11309528, at \*1 ("Given the manner in which Defendants allegedly took the trade secret(s), their alleged duplicity with Plaintiff, and considering the nature of the trade secret(s), an Order pursuant to Fed. R. Civ. P. 65 would be ineffective. Defendants could easily copy the information onto another computer or other storage media without the knowledge of Plaintiff or the Court. Further, Defendants' prior actions demonstrate a willingness to evade or ignore the law."); *see also Solar Connect, LLC v. Endicott*, No. 2:17-CV-1235, 2018 WL 2386066, at \*2 (D. Utah Apr, 6, 2018) ("The Defendants have a high level of computer and technical proficiency and there have been attempts in the past by Defendants to delete data and information from computers . . . . Furthermore, Defendants have shown a willingness to hide information and move computer files rather than comply with requests to cease use of Plaintiff's proprietary materials. Thus, it appears that Defendants would evade, avoid, or otherwise not comply with an order issued pursuant to Rule 65 . . . or other equitable remedy."); *Axis Steel Detailing, Inc. v. Prilex Detailing LLC*, No. 2:17-CV-00428-JNP, 2017 WL 8947964, at \*2 (D. Utah June 29, 2017) ("[I]t appears that Defendants would evade, avoid, or otherwise not comply with an order issued pursuant to Rule 65 . . . or other equitable remedy."); Kayman Decl. ¶¶ 4-5 & Ex. 1.

Doe        has already copied the materials, in disregard for his contractual obligations to MMA to return all documents, electronic or otherwise, and to keep information confidential.

Without this order,   Doe   could likely conceal what he did with the Trade Secrets after stealing them in such a manner (*e.g.*, wiping the USB devices and any other places he copied the information to) that MMA will never know or be able to find out.

**B.**      **MMA Will Suffer Immediate and Irreparable Injury Without Seizure**

Absent seizure of   Doe's   computers, mobile phones, electronic storage devices, and/or cloud storage devices and credentials and access thereto, MMA will continue to suffer immediate and irreparable injury.  "A trade secret once lost is, of course, lost forever." *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984).  "[I]t is clear that the loss of trade secrets cannot be measured in money damages." *Id.*  A rebuttable presumption of irreparable harm might be warranted in cases where there is a danger that, unless enjoined, a misappropriator of trade secrets will disseminate those secrets to a wider audience or otherwise irreparably impair the value of those secrets. *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009).  That presumption applies here.

Doe   copied the Trade Secrets after he was offered a job with ███████, one of MMA's principal competitors, and just prior to signing an offer letter.  Only days later, he gave notice of his intention to resign from MMA.  The clear inference is that he stole the Trade Secrets intending to use or share that information with a competitor in order to get a leg up.  And, as discussed above, he has the technical know-how to use MMA's Trade Secrets and those to whom he may transfer MMA's Trade Secrets could wrongfully "reverse engineer" the programs Doe   misappropriated.  The Trade Secrets are unquestionably proprietary and go to the core of MMA's business and competitive advantage.  (Cummings Decl. ¶¶ 12-13, 16.)   Doe   acknowledged as much in agreeing to the Fair Competition Agreement.  (Osterhus Decl. ¶ 10.)  Thus,   Doe's   actions in the short term could significantly change the current standing of the

parties and cause substantial harm.  Moreover,   Doe's   status as a foreign national, including

his possession of an ███ passport, and well-publicized efforts by foreign state and non-state

actors to procure confidential and proprietary information about U.S. businesses and markets,

significantly increases the potential harm MMA faces.   Doe   has significant business contacts

in ███ and could try to transfer MMA's Trade Secrets to an ███ competitor, possibly beyond

the reach of American courts.   (Cummings Decl. ¶ 14.)

Additionally, under the Fair Competition Agreement,   Doe   agreed MMA "will suffer

irreparable harm in the event of any actual or threatened breach" and thus consented to "the entry

of a restraining order, preliminary injunction or other preliminary, provisional or permanent court

order to enforce [the] Agreement and expressly waive[d] any security that might otherwise be

required in connection with such relief."  (Osterhus Decl. ¶ 13; Ex. 1, § 9(f).)

Doe's   continued possession of the Trade Secrets poses a grave risk to MMA's

business in ways that cannot be readily measured or compensated by money damages.  While it is

difficult at this point in time to assess the extent of MMA's damages – because the extent of

Doe's   misuse of the Trade Secrets has not yet been determined – the likelihood of further

harm if   Doe   has advance notice of an order requiring him to turn over his computer and

electronic storage devices is all the greater given the subterfuge with which he obtained the Trade

Secrets in the first instance

### C.      The Balance of Harms Weights Heavily in Favor of Seizure

The harm to MMA in denying its application for civil seizure greatly outweighs the harm

to any legitimate interests of   Doe   and the harm to any third parties who may be affected by

such seizures.  *See Axis Steel Detailing*, 2017 WL 8947964, at *2 ("Defendants will suffer no

undue hardship and minimal harm through the requested seizure" because the "seizure merely

preserves evidence that Defendants wrongfully obtained Axis' trade secrets, to which they have no legitimate claim."); *AVX Corp. v. Kim*, No. CV 6:17-00624-MGL, 2017 WL 11316598, at *3 (D.S.C. Mar. 13, 2017) ("The harm to AVX includes the harm of its valuable trade secrets being disclosed to competitors or other third parties, whereas there would be no harm to any third parties, and any harm to Kim would be minimal and no greater than the mere inconvenience of losing possession of his computers, drives, and/or smart phone for a limited time in order for forensic analysis to be completed."); *Mission Cap. Advisors LLC v. Romaka*, No. 16 CIV. 5878 (LLS), 2016 WL 11517104, at *2 (S.D.N.Y. July 29, 2016) ("Plaintiff avers that dissemination of the [trade secrets] would cause irreparable harm to Plaintiff, its business activities, and its market share, which could cause loss of revenue and competitive advantage. Defendant has no legitimate interest in Plaintiff's Contact Lists. [And] no third parties have any legitimate interests in the information.").

MMA has shown that it continues to face significant irreparable harm if   Doe   is allowed to continue to possess its valuable and confidential trade secret information or if   Doe is given advance notice of a court order directing him to turn over his computers, phones, and storage devices. (Cummings Decl. ¶ 13.) Furthermore,   Doe   chose to work for MMA and signed the Fair Competition Agreement limiting his ability to use MMA's confidential trade secret information, and there is nothing unfair in preserving evidence demonstrating the extent of   Doe's   misconduct while the merits of MMA's claims are assessed. *Mickey's Linen v. Fischer*, No. 17 C 2154, 2017 U.S. Dist. LEXIS 145513, at *64-65 (N.D. Ill. Sept. 8, 2017)

### D. MMA Is Likely to Succeed on its DTSA Claim

To establish a likelihood of success on the merits, a plaintiff "need not show that success is an absolute certainty. He need only make a showing that the probability of his prevailing is

better than fifty percent." *Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 510 (S.D.N.Y. 2017) (quoting *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988)).

The DTSA creates a private cause of action in favor of the owner of a trade secret that is misappropriated "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). The DTSA defines misappropriation as the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means[.]" 18 U.S.C. § 1839(5)(A); *KCG Holdings, Inc. v. Khandekar*, No. 17-CV-3533 (AJN), 2020 WL 1189302, at *10 (S.D.N.Y. Mar. 12, 2020). The phrase "improper" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means[.]" 18 U.S.C. § 1839(6)(A); *KCG Holdings*, 2020 WL 1189302, at *10. Injunctive relief is appropriate under the DTSA to prevent "threatened misappropriation." 18 U.S.C. § 1836(b)(3); *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*, No. 15 CIV. 211 (LGS), 2021 WL 1553926, at *12 n.7 (S.D.N.Y. Apr. 20, 2021).

### 1.    MMA's copied files are trade secrets

Under the DTSA, a trade secret includes:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if –
>> (A) the owner thereof has taken reasonable measures to keep such information secret; and
>> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3).

Likewise, New York law recognizes that technical data, programs or codes, and methods and techniques can be trade secrets. *E.g.*, *Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*, 118 F.3d 955, 968 (2d Cir. 1997) ("New York has recognized that a computer program can be a trade secret."); *Tradescape.com v. Shivaram*, 77 F. Supp. 2d 408, 419-20 (S.D.N.Y. 1999) (recognizing trade secrets to include, among others, plaintiff's source codes and other computer codes, computer programs, and software); *Invesco Institutional (N.A.), Inc. v. Deutsche Inv. Mgmt. Ams., Inc.*, 74 A.D.3d 696, 904 N.Y.S.2d 46 (1st Dep't 2010) (finding plaintiff's proprietary software and database structure were protectable trade secrets); *Belth v. Ins. Dep't*, 95 Misc. 2d 18, 20, 406 N.Y.S.2d 649, 650 (Sup. Ct. 1977) ("[T]here is no doubt that the computer programs, the mathematical models, procedures and statistical assumptions constitute trade secrets").

Here, the filed     Doe     copied from MMA's repository to his USB drive comprised MMA's trade secrets and confidential information regarding formulas, models, and other analytics used to serve MMA's clients. (Cummings Decl. ¶¶ 4, 13.) Moreover, MMA has expended substantial resources to develop the models from scratch and to continuously refine and develop the models that drive the system. (*Id.* ¶¶ 6, 13.) MMA has gone to great lengths to protect this valuable intellectual property, limiting access within MMA to only those approved individuals that require access to the files and through employee security training. (*Id.* ¶¶ 17-18.)

This information constitutes trade secrets under the DTSA because it gives MMA a commercial advantage over competitors, was imparted to     Doe     for the sole purpose of facilitating his work for MMA, is not available to the public, was kept secure and strictly confidential, is not readily ascertainable, and would not have been known to     Doe     but for his employment with MMA.

      2.      __Doe misappropriated the Trade Secrets by improper means__

As terms of his employment with MMA,   Doe   acknowledged he would have "access to information . . . that is unique and novel to [MMA], . . . that [MMA] has taken steps to protect, [and] is disclosed to [him] only in strict confidence, including . . . trade secrets." (Osterhus Decl. ¶ 10, Ex. 1, § 4.) Further,   Doe   "agree[d] not to use or disclose, without the prior written consent of the Company, both during and after your employment with the Company, . . . Confidential Information." (*Id*. ¶ 10, Ex. 1, § 4.) And   Doe   acknowledged "that all documents, in [all] form[s], received, created or used by you in connection with your employment with [MMA] are and will remain the property of [MMA] . . . . You agree to return and/or cooperate in permanently deleting all such documents . . . promptly upon the termination of your employment[.]" (*Id*. ¶ 12, Ex. 1, § 4(d).) And he would "not, under any circumstances, without the written consent of [MMA], disclose those documents to anyone outside [MMA] or use those documents for any purpose other than the advancement of [MMA's] interests." (*Id*.) He also was prohibited under MMA policy to store any MMA data on any personal device. (Cummings Decl., n.3.)

In other words,   Doe   "breach[ed] . . . a duty to maintain secrecy[.]" 18 U.S.C. § 1839(6)(A); *KCG Holdings*, 2020 WL 1189302, at *10 (defendant used improper means to acquire trade secrets when, in violation of his employer policy, he copied files into his personal directory); *AUA Priv. Equity Partners, LLC v. Soto*, No. 1:17-CV-8035-GHW, 2018 WL 1684339, at *7 (S.D.N.Y. Apr. 5, 2018) (misappropriation plausibly alleged with claims that defendant "uploaded [plaintiff's] trade secrets from her work laptop to her personal cloud-based storage without [plaintiff's] permission and in direct violation of the confidentiality agreements that she signed").

Doe   downloaded the Trade Secrets mere days before he signed an offer letter with competitor ▮▮▮▮▮▮ and less than a week before telling MMA he would resign.  Courts consider this suspicious downloading of company information in determining whether the defendant misappropriated trade secrets.  *E.g.*, *Lumenate Techs., LP v. Integrated Data Storage, LLC*, No. 13-CV-3767, 2013 WL 5974731, at *5 (N.D. Ill. Nov, 11, 2013) (citations omitted) (determining that defendant had misappropriated his employer's trade secrets based in part on evidence that the defendant downloaded data two days before resigning and then deleted the information).

Doe's   copying of MMA's Trade Secrets and transfer of data to an outside device, after having agreed to keep the protected information secret, strongly suggest MMA is likely to succeed on the merits under the DTSA.

### E.    Doe Has Actual Possession of the Trade Secrets and the Property to be Seized

MMA is seeking the seizure of any copies of MMA's Trade Secrets in   Doe's   possession located on   Doe's   computer(s), mobile phones, storage devices, or platforms at or accessible at his residence.  Based on MMA's investigation into   Doe's   misappropriation, there is compelling evidence to believe that MMA's Trade Secrets are located on this equipment, which   Doe   actually possesses.

### F.    The Seizure would be Limited to Particular Matters in a Specific Location

MMA has described the Trade Secrets that it seeks to recover with reasonable particularity and is limiting its request for seizure to only those devices located at   Doe's   residence, in an effort to minimize any intrusive aspects of the requested relief.

### G. There Is Substantial Risk that Doe Will Destroy or Conceal the Evidence of His Misconduct

If Doe is permitted to keep MMA's Trade Secrets, and is given notice that MMA has discovered his theft, he will have the opportunity and incentive to destroy the evidence of his misconduct and/or further disseminate the Trade Secrets before he is brought before the Court.

Doe copied the information while considering an offer to go to MMA's principal competitor. He lied about his post-employment intentions for a month before admitting his intent. Furthermore, Doe would be motivated to quickly hide, make additional copies or disseminate the Trade Secrets if he knows that his window to monetize or use them is quickly closing. This is precisely the type of harm that Congress intended to prevent with the seizure provision of the DTSA.

### H. MMA Has Not Publicized Its Request

MMA has not made – nor will it make before or during its execution – any statement regarding the requested seizure to any third party or the public. (Cummings Decl. ¶ 19.)

## II. An Ex Parte Temporary Restraining Order Is Also Needed to Ensure the Recovery of MMA's Trade Secrets and to Prevent Doe from Further Disseminating Them or Destroying Evidence

MMA's application for *ex parte* seizure is confined to the computers and other electronics located at Doe's residence. However, advances in technology make it a simple matter to copy the stolen data to other devices, send them through the internet, or store them on the cloud. There is reason to believe that he has stored them on the cloud, given that he searched how to back up the contents of his work phone before wiping the phone prior to returning it to MMA. Thus, injunctive relief preventing Doe from taking any further acts to disseminate MMA's Trade Secrets, wherever they may be located, and from destroying any evidence of his misappropriation

and past dissemination of the Trade Secrets, is appropriate and necessary in addition to the *ex parte* seizure requested.

Federal Rule of Civil Procedure 65 permits a court to issue a temporary restraining order ("TRO") without written or oral notice to the adverse party.  Fed. R. Civ. P. 65(b).  *Ex parte* relief is appropriate in this case.  If    Doe    is given notice that MMA has discovered his misconduct, he will have the opportunity and incentive to copy or disseminate the Trade Secrets and destroy any evidence of what he has already done with them.  Indeed, given    Doe's    technical proficiencies, he could transfer the Trade Secrets within a matter of minutes, without risk of violating any court orders.

In order to obtain a TRO, the movant must show (1) a likelihood of success on the merits or a sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction.  *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015); s*ee also AFA Dispensing Grp. B.V. v. Anheuser-Busch, Inc.*, 740 F. Supp. 2d 465, 471 (S.D.N.Y. 2010) ("[T]he standard for an entry of a temporary restraining order is the same as for a preliminary injunction.").  MMA has met each of these requisite elements.

*First*, as shown above, MMA is likely to succeed on the merits on its DTSA claims as MMA's copied files are trade secrets and    Doe    misappropriated them by improper means.  (*See* Part I.D, *supra*).  MMA's claim for misappropriation of trade secrets under New York law is also strong, as the elements of a claim under New York law are substantially the same as those of a claim for misappropriation of a trade secret under the DTSA.  To succeed on a claim for the

18

misappropriation of trade secrets under New York law, a party must demonstrate:  (1) that it possessed a trade secret (*see* Part I.D.1, *supra*), and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means (*see* Part I.D.2, *supra*).  *Wabtec Corp.*, 559 F.3d 110, 117 (2d Cir. 2009) (applying New York law).

Likewise, MMA is likely to succeed on its breach of contract claim. *JP Morgan Chase v. J.H. Elec. of N.Y., Inc.*, 69 A.D.3d 802, 803, 893 N.Y.S.2d 237, 239 (2010) ("the essential elements of a cause of action to recover damages for breach of contract [are] the existence of a contract, the plaintiff's performance under the contract, the defendant's breach of that contract, and resulting damages"). MMA and    Doe    indisputably have a binding and enforceable contract. (Osterhus Decl. ¶ 7-14.).  The parties entered into a Fair Competition Agreement for sufficient consideration, including a provision for payment of full salary for a year if MMA sought to enforce the Non-Compete agreement within.  (*Id.* ¶ 7.)  MMA has performed its obligations under the Fair Competition Agreement, including payments to enforce the Non-Compete agreement;    Doe    cannot reasonably claim otherwise.  MMA can show that    Doe    breached the Fair Competition Agreement by stealing MMA's confidential information.  As discussed above, MMA will also suffer damages in the form of, without limitation, lost market share, its competitive position in the market, and goodwill.  These damages are sufficient to support a breach of contract claim.

*Second*, and also as shown above, MMA will suffer irreparable harm without an injunction as    Doe's    use or dissemination of the Trade Secrets will cause long-lasting, incalculable harm to MMA's competitive position. (Cummings Decl. ¶ 13; *see also* Part I.B, *supra*.)  "A trade secret once lost is, of course, lost forever." *Capstone Logistics Holdings, Inc. v. Navarrete*, No. 17-CV-4819 (GBD), 2018 WL 6786338, at *34 (S.D.N.Y. Oct. 25, 2018) (cleaned up).

*Third*, and again as established above, the balance of harms or hardships favors MMA. (*See* Part I.C, *supra*).

*Fourth*, the public interest supports the entry of injunctive relief in favor of MMA. "Injunctive relief would serve the public interest by . . . protecting plaintiff's legitimate interests in maintaining . . . the secrecy of its trade secrets and confidential information." *Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F.Supp.3d 303, 347 (E.D.N.Y. 2020); *see also Mazak Optonics Corp. v. Marlette*, No. 17 C 1023, 2017 WL 3394727, at *3 (N.D. Ill. Aug. 8, 2017) (The "public interest is supported by upholding the sanctity of confidential information such as trade secrets and preventing others from the unauthorized use of such confidential information for their own benefit.").

The public interest will also be served by the enforcement of the parties' lawful agreement. *Benihana, Inc.*, 784 F.3d at 897; *Intertek Testing*, 443 F.Supp.3d at 347.   Doe   was paid and received the benefits accorded to him under the Fair Competition Agreement.  As part of his Non-Compete, he is being paid his full salary while doing no work for MMA.  He cannot now avoid his own obligations.

## CONCLUSION

For all these reasons, Plaintiff Ipsos MMA, Inc. respectfully requests that its application for seizure and for temporary restraining orders be granted in its entirety.

[*remainder of page intentionally left blank*]

Dated: October 28, 2021

Respectfully submitted,

By: _____

Steven M. Kayman
Jordan B. Leader
William G. Fassuliotis
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Phone: (212) 969-3430
Fax: (212) 969-2900
skayman@proskauer.com
jleader@proskauer.com
wfassuliotis@proskauer.com

*Attorneys for Plaintiff Ipsos MMA, Inc.*

21